# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Blanche M. Manning | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 01CR 434 | **DATE** | April 4, 2003 |
| **CASE TITLE** | *United States v. Larry Neal and James Oliver* | | |

**MOTION:**

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
    ☐ FRCP4(m)    ☐ General Rule 21    ☐ FRCP41(a)(1)    ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] For the reasons set forth in the attached Memorandum and Order, the Court DENIES Defendants' motions to quash their arrests and suppress evidence obtained as a result of the arrests [31-1 and 21-1]. It is so ordered.

(11) ☐ [For further detail see order on the reverse side of the original minute order.]

| | | | | | |
|---|---|---|---|---|---|
| | No notices required, advised in open court. | | | | **Document Number** |
| | No notices required. | | | number of notices | |
| ✓ | Notices mailed by judge's staff. | | | APR 07 2003 | |
| | Notified counsel by telephone. | | | date docketed | |
| | Docketing to mail notices. | | | | 50 |
| | Mail AO 450 form. | | | docketing deputy initials | |
| | Copy to judge/magistrate judge. | | | | |
| RTS | courtroom deputy's initials | | | date mailed notice | |
| | | Date/time received in central Clerk's Office | | mailing deputy initials | |

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| | ) | **Hon. Blanche M. Manning** |
| v. | ) | |
| | ) | **01 CR 434** |
| LARRY NEAL and JAMES OLIVER | ) | |

### MEMORANDUM AND ORDER

On October 25, 2001, a federal grand jury returned a four count indictment against

Defendants Larry Neal and James Oliver, alleging that they conspired to possess and did possess

approximately $12,000 in counterfeit United States currency, in violation of 18 U.S.C. § 472, and

conspired with each other to possess a controlled substance with intent to deliver, in violation of

21 U.S.C. § 846. The present matter comes before the court on Defendants' motions to quash

their arrests and suppress evidence obtained as a result of the arrests [31-1 and 21-1].

### BACKGROUND[1]

On May 2, 2001, agents Glynn and Alznauer of the Drug Enforcement Agency's ("DEA")

Chicago interdiction task force ("the Task Force"), were on patrol at Midway Airport in Chicago.

The Task Force attempts to identify and intercept couriers of drugs and narcotics-related currency

at airports and bus and train stations. Agent Glyn has been with the DEA for 14 years, while

---

[1]    The Background facts are taken from the transcript of the suppression hearing and the parties' submissions. At the suppression hearing, the only witnesses to testify were the two agents who interviewed Defendants and discovered the counterfeit money. Defendants contend that the agents' testimony was not credible because of inconsistencies in their testimony and the fact that some of the facts that the agents testified to were not contained in their reports. After observing their demeanor and evaluating the reasonableness of the testimony, this Court finds the agents' testimony to be credible.



agent Alznauer for four years. In all, they had performed hundreds of seizures based on interdictions.

The agents, who were dressed in plain clothes with guns and handcuffs hidden, were on patrol at Gate-B12, observing passengers boarding a plane leaving at 9:30 p.m. for Los Angeles. According to the agents, Los Angeles is a frequent location for couriers of drug-related currency. Around 9:00 p.m., after the plane had already begun boarding, the agents first noticed Defendants because they arrived late, after most of the passengers had already boarded the plane. The agents grew suspicious when they noticed that Defendants were walking together and conversing, but as they neared the gate, Defendants began to walk slowly and then separated and acted like they were no longer traveling together. Although Defendants separated, the agents noticed that they maintained eye contact with each other and were glancing furtively around the concourse.

According to the agents, based on their training and experience, persons arriving late and traveling separately are two common characteristics of drug and/or money couriers. After observing Defendant Oliver get in line at the check-in counter and then walk away from the gate, the agents decided to "conduct a consensual interview" with him. At this time, Defendant Neal was outside the agents' sight.

The agents then approached Oliver and agent Glynn produced his badge and identified them as police officers. Standing a couple of feet from Oliver, in a "very polite" tone, agent Glynn told Oliver that he "was not under arrest, [and] that he was free to leave and was not in any trouble" and that they would like to ask him some questions. Oliver stated that he understood and agreed to talk to the agents.

Shortly after the agents approached Oliver, Neal walked up to the three of them and asked "what was going on." Agent Glynn then produced his badge and explained that the agents were

asking Oliver some questions and that Neal "was not under arrest and the he was free to leave." Agent Glynn also asked Neal if "he would answer some questions also." Neal responded that he did not mind answering the agents' questions.

After Defendants agreed to answer the agents' questions, agent Glynn asked to look at their tickets. Defendants voluntarily handed over their tickets. Agent Glynn quickly observed the tickets and then returned them. He then asked Defendants questions regarding their travel plans. Defendants did not know who had purchased their tickets or whether the tickets were purchased with cash. They stated that the purpose of their trip to Los Angeles was to "kick it" with their friends for a few days. However, Defendants stated that they did not have round-trip tickets.

Agent Glynn also asked if Defendants were carrying narcotics or large amounts of cash. After Defendants said they were not, agent Glynn asked them how much money they were carrying. They told him that they had about $200 each. Agent Glynn then asked if he could see the money. Defendants then reached in their pockets and showed the agents what appeared to be about $200. After looking at the money, without touching it, agent Glynn told Defendants that they could put the money back in their pockets.

Once Defendants had the money back in their pockets, Agent Glynn asked Neal if he "would grant [agent Glynn] permission to conduct a quick pat-down search of his person to make sure that he did not have any large amounts of cash or drugs on his person." After Neal gave permission, agent Glynn started the pat down with Neal's left boot. Immediately after touching his left boot, agent Glynn felt a "large bulge rectangular in shape." Based on his experience in doing interdictions, agent Glynn believed that this bulge was consistent with "the size and shape"

of a large bundle of currency. The agent asked Neal what was in his boot and Neal stated that it was "nothing."

During the above questioning, pursuant to DEA interdiction procedures, the agents were standing with their backs to the wall with ample space between the agents and Defendants. Defendants appeared shaky and nervous and were continuously looking down towards the ground. Defendants never told the agents that they need to leave because they were going to miss their flight.

After detecting what he believed a large amount of currency, agent Glynn gave agent Alznauer a look indicating he had found contraband and asked Defendants if they would be "willing to accompany [the agents] to our office? It's in the airport. We'll go talk about this further." In response, Defendants agreed to go to their office. The agents and Defendants then walked five minutes to the DEA's airport office. Defendants were not handcuffed or restrained in any way. Agent Glynn walked next to Neal, while agent Alznauer and Oliver followed behind.

During the five minute walk to the DEA office, the agents and Defendants engaged in "general conversation." In response to agent Glynn's question of how much money he had, Neal stated that he had $10,000 or $11,000, and that it was not his money and he did not have a job or file income taxes. Similarly, Oliver told agent Alznauer that he was carrying $5,000. Additionally, at some point, Defendants stated that they were going to use the money to "rip off a Mexican for a kilo" in Los Angeles.

Once they arrived at the DEA office, the agents conducted a "quick pat-down" of Defendants to make sure they did not have any weapons. The agents then asked Defendants to

put all money in their possession on a table in the office. After Defendants complied with this request, the agents put the money (which is now known to be $12,000) in a DEA evidence bag. The agents then told Defendants, who were not handcuffed and sitting in chairs in the DEA office, that their money was going to be confiscated on the grounds that it was drug-money. The agents, however, were not going to arrest Defendants. According to the agents, Defendants were free to leave at that time but without their money. The agents then informed Defendants that they were preparing paperwork regarding the seizure of the money, which was to serve as a receipt for the seized money.

While preparing the paperwork, a third agent, Jack Howard, noticed that some of the serial numbers on the money "were similar or the same." As a result, the agents became suspicious that the money was counterfeit. As a result, the agents contacted the Secret Service, who sent its agents to Midway. After the Secret Service agents arrived, they determined that the money was indeed counterfeit. At that point, the Secret Service took over the investigation and arrested Defendants. Both Defendants signed <u>Miranda</u> waivers and signed written statements that they purchased the counterfeit currency to obtain drugs in California.

Subsequently, Defendants were charged with possession of counterfeit currency and conspiracy to possess a controlled substance with intent to deliver. In response, Defendants brought the instant motions to suppress.

## DISCUSSION

Defendants have moved to suppress their arrests and evidence obtained as a result of their arrests on the grounds that Defendants': (1) initial encounter with the agents was an illegal seizure/stop; and (2) removal to the DEA office was an arrest without probable cause. Before discussing the specific facts of this case, the Court will review the law on search and seizures.

The Fourth Amendment protects the right of the people to be secure in their persons and property against unreasonable searches and seizures. U.S. Const. Amend. IV. With respect to "seizures" of persons, the Fourth Amendment protects not only traditional arrests but also brief detentions. Terry v. Ohio, 392 U.S. 1, 16 (1968). The Supreme Court, however, has held that "not all personal intercourse between policemen and citizens involves seizures of persons." Id. 19 n. 16. With regard to the Fourth Amendment, there are three distinct categories of police-citizen encounters: (1) arrests, which must be supported by probable cause; (2) investigatory stops (Terry stops) – brief, nonintrusive periods of detention – which must be supported by a reasonable suspicion that a person has committed or is committing a crime; and (3) voluntary encounters, characterized by cooperation and non-coercive government questioning. United States v. Nobles, 69 F.3d 172, 179-80 (7th Cir. 1995).

"A person is seized within the meaning of the Fourth Amendment only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." Michigan v. Chesternut, 486 U.S. 567, 573 (1988). Examples of factors that may induce a person to believe that he was not free to leave are the threatening presence of several officers, display of their weapons, physical touching of the detained person, use of forceful language or tone of voice, and the remoteness of the place of detainment. United States v. Mendenhall, 446 U.S. 544, 554 (1980). To justify a brief detention and seizure, the accosting

law enforcement agent must "be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant [such] intrusion." Terry, 392 U.S. at 21.

In contrast, voluntary encounters, including voluntary searches, are not considered seizures within the Fourth Amendment, and need not be supported by any articulable basis or reasonable suspicion. Nobles, 69 F.3d at 179-80; United States v. McCarthur, 6 F.3d 1270, 1275 (7th Cir.1993); United States v. Withers, 972 F.2d 837, 841 (7th Cir. 1992). To determine whether the search was consensual, courts examine whether: (1) the encounter took place in public, United States v. Adebayo, 985 F.2d 1333, 1338 (7th Cir.1993); (2) the agents informed the suspect that he was not under arrest, United States v. Edwards, 898 F.2d 1273, 1276 (7th Cir.1990); (3) the agents informed the person that he was a specific target of a police investigation, United States v. Borys, 766 F.2d 304, 310 (7th Cir. 1986); (4) the suspect was deprived of documents such as a passport or a plane ticket without which he could not leave, id.; and (5) there was any physical touching, display of weapons, or other show of force, United States v. Johnson, 910 F.2d 1506, 1510 (7th Cir.1990). See also Nobles, 69 F.3d at 180-81 (setting out factors to determine whether a stop is consensual). Based on these factors, the court must determine whether, given the totality of the circumstance, a reasonable person would have believed he was free to deny consent. See Withers, 972 F.2d at 841.

In Nobles, 69 F.3d at 181-82, a case similar to the instant action, the Seventh Circuit, affirming the district court's denial of the defendants' motion to suppress, held that the defendants, who were carrying drugs in an airport, voluntarily consented to answer the agents' questions and to a search of their bag. The defendants boarded a plane, from Los Angeles to

Chicago, right before it took off and paid cash for their tickets that day. Id. at 176. After being

alerted by the authorities in Los Angeles, two agents of the Chicago DEA Task Force observed

the passengers departing from the plane. Id. Other than their names, the agents had no other

description of the suspects. Id. The agents observed two men, later identified as the defendants,

walking behind each other and "frequently looking over their shoulders." Id.

After observing the defendants for a short time, the two agents approached them and

identified themselves as police and asked them whether "they would answer a few questions."

Id. The officers were standing two to three feet away from the defendants and did not block or

impede them from leaving the area. Id. As the agents showed the defendants their identification,

one of the defendant's "hands began shaking." Id. After the defendants agreed to answer their

questions, the agents asked them their names and how long they had been in Los Angeles. Id. at

177.

The agents then explained that they were conducting "narcotics interdictions" and that the

defendants "were not under arrest and were free to leave at any time," but that they would like to

ask them some more questions. Id. After stating that they would answer more questions, the

agents noticed that one of the defendants was "sweating profusely" and that both defendants were

acting nervously. Id. After asking the defendants a few more non-intrusive questions, the

officers again told the defendants that they were not under arrest and were free to leave and that

the agents would like to look in a bag one of the defendants was carrying. Id. The defendant

who was holding the bag stated "go ahead," and dropped the bag on the ground. Id. After a

cursory look inside the bag, the police found what looked to be cocaine. Id. At that time, the

agents placed the defendants under arrest. Id.

On appeal, the defendants contended that their "entire encounter with the officers leading up to the search of the bag was unconstitutional [under Terry] because the officers did not have specific and articulable facts to justify stopping and questioning" the defendants. Id. at 179. Rejecting this contention, the court, applying the factors discussed above, found that, based on the totality of the circumstances, the defendants voluntarily consented to speak with the police and to the search of the bag, and therefore, the police did not need any articulable suspicion. Id. at 181. In making this conclusion, the court noted that a reasonable person in the defendants' position would have felt free to leave the scene because: (1) the officers were in plain clothes without viable weapons or handcuffs; (2) the encounter took place in a public area in an airport; (3) the agents did not impede the defendants or physically restrain them; (4) the agents told the defendants that they were not under arrest and were free to leave; and (5) the officers used a "normal conversational" tone in speaking to the defendants. Id.

Here, the agents initially approached Defendant Oliver because Defendants fit the profile of drug-money couriers -- they arrived late, after most of the passengers had already boarded the plane and were walking together and conversing, but as they neared the gate, began to walk slowly and then separated and acted like they were no longer traveling together but maintained eye contact. The agents, who were dressed in civilian clothes with their weapons and handcuffs hidden, identified themselves as police officers. Standing a couple of feet from Oliver, in a "very polite" tone, agent Glynn told Oliver that he "was not under arrest, [and] that he was free to leave and was not in any trouble" and that they would like to ask him some questions. Oliver stated that he understood and agreed to talk to the agents. Almost immediately thereafter, Neal walked up to the three of them and asked "what was going on." Agent Glynn then produced his badge

and explained that the agents were asking Oliver some questions and that Neal "was not under arrest and the he was free to leave." Agent Glynn also asked Neal if "he would answer some questions." Neal responded that he did not mind answering the agents' questions.

After Defendants agreed to answer the agents' questions, agent Glynn asked to look at their tickets. Defendants voluntarily handed over their tickets. Agent Glynn quickly observed the tickets and then returned them. He then asked Defendants questions regarding their travel plans. Agent Glynn also asked Defendants if they were carrying narcotics or large amounts of cash. He then politely asked Neal if he "would grant [him] permission to conduct a quick pat-down search of his person to make sure that he did not have any large amounts of cash or drugs on his person." After Neal gave him permission, agent Glynn felt a "large bulge rectangular in shape" in Neal's boot. Based on his experience in doing interdictions, agent Glynn believed that this bulge was consistent with "the size and shape" of a large bundle of currency. The agent then asked Neal what was in his boot and Neal stated that it was "nothing."

After examining the above events, this Court finds that, based on the totality of the circumstances and the factors set forth above in Nobles, a reasonable person in Defendants' position would have felt free to leave the scene, and therefore, Defendants voluntarily consented to speak with the agents and Neal voluntarily consented to the pat down. As in Noble, the officers were in plain clothes without viable weapons or handcuffs; the encounter took place in a public area in an airport; the agents did not impede the defendants or physically restrain them; the agents told the defendants that they were not under arrest and were free to leave; and the officers used a "normal conversational" tone in speaking to the defendants.

-10-

Additionally, the Court finds that Defendants voluntarily consented to accompany the agents to the DEA office at the airport. After detecting what he believed a large amount of currency in Neal's boot, agent Glynn asked Defendants if they would be "willing to accompany [the agents] to our office? It's in the airport. We'll go talk about this further." In response, Defendants agreed to go to their office. The agents and Defendants, who were not handcuffed or restrained in any way, then walked five minutes to the DEA's airport office. During the five minute walk to the DEA office, Defendants admitted that they had over $10,000 in cash between them and that they did not work or file taxes.

Once they arrived at the DEA office, the agents conducted a "quick pat-down" of Defendants to make sure they did not have any weapons. The agents then asked Defendants to put all money in their possession on a table in the office. After Defendants voluntarily complied with this request, the agents then put the money (which is now known to be $12,000) in a DEA evidence bag. The agents then told Defendants, who were not handcuffed and sitting in chairs in the DEA office, that their money was going to be confiscated on the grounds that it was drug-money. The agents, however, were not going to arrest Defendants. According to the agents, Defendants were free to leave at that time but without their money. Only after the agents suspected that the money was counterfeit were Defendants not free to leave.

Similar to the initial encounter, after examining the above events, this Court finds that, based on the totality of the circumstances and the factors set forth above in Nobles, a reasonable person in Defendants' position would have felt free to leave the scene, and therefore, Defendants voluntarily consented to accompany the agents to the DEA office and to turn their money over to the agents for inspection.

Moreover, even if this Court found that Defendants did not voluntarily consent to go to the DEA office, this Court finds that the agents had a reasonable suspicion that Defendants were involved in drug or drug-related currency smuggling, and therefore, were justified in performing a short investigatory stop at the DEA office. A police officer, who lacks probable cause for an arrest, may stop a suspect to briefly investigate the circumstances provoking the officer's suspicion that the suspect was or is about to engage in criminal activity (a Terry Stop). Terry v. Ohio, 392 U.S. 1 (1968). To make a Terry Stop, the officer must be "able to point to specific and articulable facts which, taken together with rational inferences from those facts," give rise to a reasonable suspicion that the person is or was committing a crime. Id. at 21. See also United States v. Vega, 72 F.3d 507, 515 (7th Cir. 1995). To determine if the officer had a "reasonable suspicion" of criminal activity, the court must examine the "totality of the circumstances as they appeared to the officer at the time of the stop." United States v. Ocampo, 890 F.2d 1363, 1368 (7th Cir. 1989).

Here, based on his experience in doing interdictions, agent Glynn believed that the bulge in Neal's left boot was consistent with "the size and shape" of a large bundle of currency. Once, he made this discovery, in addition to the other circumstances, agent Glynn had reasonable suspicion that Defendants were engaged in criminal activity. Moreover, given that this incident took place in an airport, it was reasonable for the agents to request that Defendants accompany them back to the DEA office in the airport. The agents at no time used force, threatened Defendants, or placed Defendants in Handcuffs. Once at the DEA office, Defendants voluntarily turned over the money which they were carrying.

## CONCLUSION

For the foregoing reasons, the Court DENIES Defendants' motions to quash their arrests and suppress evidence obtained as a result of the arrests [31-1 and 21-1].

It is so ordered.

ENTER:

_Blanche M. Manning_
__BLANCHE M. MANNING__
__U.S. DISTRICT COURT JUDGE__

DATE: _4-4-03_